FILED
NOV 19 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NOE MELENDEZ,                                          Civ. No. 07-875-AC

                            Plaintiff,                OPINION AND
                                                      ORDER

        v.

MORROW COUNTY SCHOOL
DISTRICT, MARK BURROWS, and
RONALD ANTHONY,

                            Defendants.

_____

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Noe Melendez ("Melendez") filed suit in federal district court against defendants

Morrow County School District ("the District"), District Superintendent Mark Burrows ("Defendant

Burrows"), and Irrigon High School Principal Ronald Anthony ("Defendant Anthony") (collectively

OPINION AND ORDER                         1                         {KPR}

"Defendants"). Melendez has alleged claims arising under 42 U.S.C. § 2000e *et seq.* ("Title VII") and Oregon Revised Statues ("ORS") 659A.030 *et seq.*, for discrimination based on race and national origin; the Americans With Disabilities Act, 42 U.S.C. § 12201 ("the ADA") and ORS 659A.100 *et seq.*, for discrimination based on anxiety and sleep-related disability; Oregon's Whistleblower Law, ORS 659A.230; 42 U.S.C. § 1983 ("section 1983") for civil rights violations; and wrongful termination under Oregon common law.

This opinion concerns four motions. First, Defendants District and Burrows filed a motion for summary judgment on all claims. Second, Defendant Anthony filed a motion for summary judgment on all claims. As necessary, the court will distinguish between these two motions for summary judgment by referring to them as "MSJ I" and "MSJ II," respectively. Third, Defendants District and Burrows filed a motion to strike portions of the declarations of Melendez, his wife Elizabeth Melendez, and Greg Lyons. Fourth, Defendants moved to supplement the record.

Defendants District and Burrows's motion for summary judgment is granted as to the wrongful discharge and section 1983 claims. The motion is denied as to all other claims. Defendant Anthony's motion for summary judgment is denied, except to the extent that some of his evidentiary objections are granted. The District and Defendant Burrows's motion to strike is granted in part and denied in part, and their motion to supplement the summary judgment record is denied.

## *Factual Background*

Melendez suffers from anxiety, depression, and insomnia. Since March 2001, he has received treatment for anxiety. (Melendez Declaration ("Decl.") ¶ 6.) In September 2001, the District hired Melendez to work at Irrigon High School as an educational assistant ("EA"). (Bennett Decl. Exhibit ("Ex.") 1.) At the time of his hire, Melendez did not request accommodation for any

disabilities. (Defendants' ("Defs.'") Concise Statement of Material Facts ("CSMF") ¶ 2.) Defendant Anthony was the Principal of Irrigon High School from Fall 2000 through Spring 2006. While filling out employment-related paperwork, Melendez told Defendant Anthony that he was a legal resident of the United States, but not a citizen. Defendant Anthony told Melendez to indicate that he was a United States citizen on his paperwork because it did not really matter for their purposes. (Melendez Deposition ("Depo.") 44:5-12; 47:9-16.) To Melendez's knowledge, only Defendant Anthony knew that Melendez was a citizen of Mexico, and not the United States. (Melendez Depo. 51:4-8.)

Over the course of his employment with the District, Melendez was evaluated five times. These evaluations occurred on January 16, 2002, June 7, 2002, June 3, 2003, May 24, 2004, and June 1, 2005. (Melendez Decl. Ex. A-D, I.) Melendez consistently received an overall rating of "Meets Expectations – Continue Employment," when evaluated. (Plaintiff's ("Pl.'s") CSMF ¶ 51.) Two of these evaluations cited a need for improvement in "Punctuality and Attendance," and one evaluation cited a need for improvement in the area of "Initiative." (Melendez Decl. Ex. B, C.) Melendez's final evaluation did not cite any areas in need of improvement. (Melendez Decl. Ex. I.)

Beginning in 2002, Melendez tried repeatedly and unsuccessfully to get a coaching position at the school. (Melendez Depo. 159:19-21.) Prior to this, Melendez had been told he had to "try out" for a coaching position and was "humiliated" when a Caucasian man "just out of High School" was hired instead of Melendez. *Id.*

In October 2003, Defendant Anthony assigned Melendez to cafeteria lunch duty. (Melendez Decl. ¶ 14.) Defendant Anthony also told Melendez to empty trash bins while on duty. *Id.* This task was not usually assigned to EAs and was typically performed by the janitorial staff. (Bennett Decl.

Ex. 35.) As another staff member, Greg Lyons ("Lyons") testified: "During my employment at the High School, I witnessed Noe Melendez empty trash bins and put away tables. To my knowledge, no other [aide] was required to perform these types of tasks." (Lyons Decl. ¶ 4.) Defendant Anthony also testified that aides on cafeteria duty were not typically required to perform janitorial duties. (Anthony Depo. 28:16-24.)

On October 21, 2003, and October 23, 2003, Melendez was admitted to a hospital and treated for "abdominal pain, anxiety and insomnia." (Melendez Decl. ¶ 15.) Melendez went to an urgent care facility on July 15, 2004, in part due to problems with "anxiety and insomnia." (Melendez Decl. ¶ 21.) In September 2004, Melendez informed Joel Chavez ("Chavez"), the District English Language Learners Director, of his anxiety and insomnia but was not offered any accommodations. (Melendez Decl. ¶ 24.)

On February 5, 2004, the District informed all EAs that a new federal policy had been enacted under the No Child Left Behind Act. This policy required all EAs to become "highly qualified" to maintain employment with the District. (Bennett Decl., Ex. 6 at ¶ 2-3.) To be "highly qualified," an EA was required to pass a basic skills test ("the test"). (Bennett Decl., Ex. 7 at 4.) The test was not administered by the District. (Ashbeck Decl. ¶ 4.) Melendez, an EA hired prior to January 8, 2002, was required to pass the test no later than January 8, 2006, to maintain employment. (Melendez Depo. 277:6-8.) Melendez was notified of the testing requirement and was provided training and reminders in preparation for taking the test. (Bennett Decl., Ex. 7 at 5; Melendez Depo. 277:10-18.)

Melendez first took the test in August 2005 and failed the math section. (Melendez Depo. 278:6-279:3.) Melendez received at least two reminders that he still needed to pass the test to

maintain employment with the District.  (Bennett Decl. Ex. 11; Melendez Decl. ¶ 48.)  Each time

Melendez took the test, he failed only the math section.

Melendez's wife, Elizabeth Melendez, served as a home school liaison for the District,

beginning in 2004.  On September 30, 2004, Melendez reported a change of address via email.

Rhonda Lorenz forwarded this email to Julie Ashbeck ("Ashbeck") and wrote: "FYI – I can't say

if Elizabeth moved with him[.]"  (Melendez Decl. Ex. E.)  Melendez felt this was a slight against

Hispanic persons.  (Melendez Decl. ¶ 23 and Ex. E.)

On October 5, 2004, Melendez witnessed an incident of child abuse involving an assistant

football coach, Lonnie Rill ("Rill"), and a male student (hereinafter "the B.H. incident"), when Rill

twisted the nipples of the student and lifted him off the ground.  (Melendez Depo. 124:6-22.)

Melendez reported the incident to the head coach, Lyons, and another teacher, Lori Monaco.  Lyons

then reported the B.H. incident to the athletic director, Larry French ("French"), and Defendant

Anthony. (Melendez Depo. 157:3-6; 125:13-126:10.)  Defendant Anthony reprimanded Rill, but did

not report the B.H. incident to any other person or entity at that time.  (Burrows Depo. 83:10-16.)

According to Melendez, he also reported to Defendant Anthony that Rill made derogatory comments

about Hispanic student football players.  Rill is a friend of Defendant Anthony's son and has been

since high school. (Anthony Depo. 46:9-15.)  Melendez subsequently reported the B.H. incident to

the Morrow County Sheriff's Department.  (Melendez Depo. 134:1-7.)

On March 28, 2005, Melendez saw Dr. Joseph Gifford for anxiety and insomnia and received

a prescription for Zoloft. (Melendez Decl. ¶ 29.)  In August 2005, Melendez contacted and met with

Defendant Burrows to discuss the B.H. incident, poor treatment of Melendez generally, and the fact

that Melendez had never received a coaching position, despite repeated requests since 2002.

OPINION AND ORDER                              5                                    {KPR}

On August 14, 2005, Melendez and Lyons spoke with Chavez. They informed him that they felt retaliated against by Defendant Anthony, among others, after reporting of the B.H. incident. On August 18, 2005, Melendez and Lyons met with Defendant Burrows and Ashbeck and complained of retaliation for reporting the B.H. incident, being denied a coaching position, and being ordered to perform janitorial duties. Melendez also reported that French had sent an offensive email to various staff members. The email included a series of photographs of female bodybuilders and a question as to what happened once the women stopped bodybuilding. The "punch line" of the email was a photograph of an obese female, scantily clad and in a sexually suggestive position, with the caption: "Remind me to NEVER exercise!" (Melendez Decl., Ex. II.)

Sometime in August 2005, Melendez and Defendant Burrows met at a local bar. (Melendez Decl. ¶ 38.) According to Melendez, Defendant Burrows urged him to keep the incident involving the offensive email from French confidential. Melendez felt that Defendant Burrows's comments contained an implied threat of retaliation if Melendez continued to report instances of child abuse or discrimination. On August 26, 2005, Defendant Burrows issued a "Risk Management Report" addressing Melendez's issues. (Melendez Decl. Ex. J.) The report stated: "[Melendez] told Mr. Chavez that he feels he is being discriminated against by Principal, Ron Anthony, insomuch as Mr. Anthony has not hired Mr. Melendez for coaching positions he has applied for." *Id.* at 1. The report described the B.H. incident and revealed that Defendant Anthony was aware of the incident and did not report it to outside authorities because "he did not believe that it was anything more than horseplay." *Id.* at 2. The report concluded that, among other things, there had been assault and battery of a minor and both a legal and ethical failure to report child abuse as required by law. On September 6, 2005, Defendant Anthony received a reprimand which stated: "Some staff members

OPINION AND ORDER                    6                         {KPR}

at IJSH reported to the risk management team that they believe that there is an 'inside group' that is treated differently than other staff members." (Melendez Decl. Ex. N.)

On August 29, 2005, Melendez was hospitalized for four days due to anxiety, depression, and irritable bowel syndrome. (Melendez Decl.¶ 40.) He was also experiencing insomnia and "would sleep for only three to four hours per night, and not well." *Id.*

In a September 13, 2005, email, Melendez requested a meeting with Defendant Burrows to discuss both an unspecified incident that took place the day before and "years of discriminatory treatment. (not racial)." (Bennett Decl. Ex. 34.) On September 29, 2005, Melendez's union representative sent a letter to Defendant Burrows about Melendez's treatment. It read, in relevant part: "I wanted to make clear that when Noe consulted me about his concerns on the way he was being treated, he at no time suggested it was racially motivated. . . . I feel it should be made clear that Noe does not think that Mr. Anthony has any racial animosity or issues with him." (Bennett Decl. Ex. 35.) At this point, the District investigated Melendez's complaints, which resulted in dismissal of the assistant coach and a written reprimand of Defendant Anthony. (Bennett Decl., Ex. 37 at 2, 11.) An investigative report was prepared and Melendez received a copy of this report. (Melendez Depo. 176:14-18.)

On October 10, 2005, Melendez complained of retaliation for reporting child abuse and discrimination and asked the board to take action. According to Melendez, the board "ignored [him] and told [him] to move on." (Melendez Decl. ¶ 49.) On October 13, 2005, Melendez refused to comply with a request that he supervise students putting the lunch tables away. The parties dispute whether, in response to his refusal, a Caucasian cafeteria employee, Linda Fox, took a french fry off the floor and placed in on Melendez's plate. Melendez, who claims that this happened, felt that Ms.

Fox "was implying that as a Mexican [he] should know [his] place and was perpetuating a negative racial stereotype." (Melendez Decl. ¶ 50.)

On October 17, 2005, Melendez and Defendant Burrows met.   This meeting was memorialized by Defendant Burrows in an October 20, 2009, letter.   (Melendez Decl. Ex. Q.)   The letter stated that Defendant Burrows was committed to fair treatment of all employees; that Melendez's prior allegations had been investigated and resolved; that Defendant Burrows would ensure Melendez had an opportunity to apply for coaching positions; that Defendant Burrows had discouraged Melendez from publicly discussing confidential school matters; and that Melendez should report any new wrongdoing to Defendant Burrows or a union representative. *Id.*

On October 24, 2005, Defendant Burrows again sent Melendez a letter of warning. (Melendez Decl. Ex. U.)   The letter was in response to a report that, on October 13, 2009, "while [Melendez was] being paid to supervise a football game[, he] revealed confidential information . . . to a patron and threatened to go to the press." (Bennett Decl., Ex. 42 at 1.)   In the letter, Defendant Burrows stated that the B.H. incident had been thoroughly investigated and resolved; matters involving staff and students at the school were often confidential; other employees had complained that Melendez had disclosed confidential information inappropriately; and Melendez's disclosures were contrary to his job description and harmful to the school. *Id.*  The letter concluded:

> Please consider this letter a warning.  You are being directed to cease and desist from using your work time to lobby other employees.  You must maintain confidentiality about school employees and children.  You have the right to respond in writing to this warning, and have that response attached to this document.  Any further actions of this nature may result in further disciplinary action, up to and including dismissal.

*Id.* Melendez felt this letter was an "implied threat to dissuade [him] from reporting child abuse and

discrimination." (Melendez Decl. ¶ 54.)

On November 14, 2005, Melendez was given a position as assistant coach of the boy's basketball team at Irrigon Junior High School. (Melendez Decl. ¶ 61.)

On November 16, 2005, Melendez had plans to ride to Pendleton, Oregon, with two other district employees in order to retake the test. (Melendez Decl. ¶ 62.) Melendez had to drive himself, however, because the two employees left without him at the urging of Karli Cook ("Cook"), another district employee who stated that Melendez was not suitable to ride with them. *Id.* Cook was formerly under the direct supervision of Defendant Anthony. (Anthony Depo. 87:11-18.) According to Melendez, this caused him to be late for the test and very anxious upon taking it, both of which contributed to his failure to pass the test. (Melendez Decl. ¶ 62.) The incident was investigated and the district concluded that Cook had behaved inappropriately. Cook "admitted that she had made comments . . . that were inappropriate and unnecessary concerning [Melendez]." (Melendez Decl. Ex. AA.)

Melendez was involuntarily transferred to the Morrow County Alternative Education Program. (Bennett Decl., Ex. 48 at 2.) He was informed of this transfer on December 3, 2005. *Id.* at 4. Burrows was responsible for this assignment. Melendez and Lyons met with Berto Hernandez, a school board member, to complain of retaliation, and Melendez was told not to involve Chavez in his problems. (Melendez Decl. ¶ 70.) After his transfer, Melendez was no longer under the supervision of Defendant Anthony although they continued to have contact during Melendez's tenure as an assistant basketball coach. (Anthony Decl. 2.)

In February 2006, the district extended the passage deadline for all EAs "to the end of the 2005-2006 school year." (Bennett Decl., Ex. 13 at 5.) On March 9, 2006, Melendez was diagnosed

with Generalized Anxiety Disorder ("GAD") and prescribed Zoloft for anxiety and difficulty sleeping. (Melendez Decl. ¶ 78.)

On March 14, 2006, Melendez reported to Defendant Burrows that he had received another offensive email from another District employee, athletic director French. Defendant Burrows initially asked Melendez if he had accessed French's computer and sent the offensive email and photos to himself. (Burrows Depo. 127:3-7.) After reporting this incident, Melendez's email access was temporarily interrupted. Following an investigation that substantiated Melendez's report, "Burrows issued discipline letters to the parties involved and all District employees were reminded of the District's policy regarding the Internet and appropriate email use." (Defs.' CSMF ¶ 45.) French was placed on two weeks of administrative leave, without pay. (Melendez Decl. ¶ 81.) Melendez also reported an incident of child abuse involving a Caucasian teacher, Fred Long, and a Hispanic student. (Anthony Depo. 93:2-94:1.) Mr. Long was given a letter of reprimand as a result. (Anthony Depo. 93: 18-21.) He and Defendant Anthony occasionally play golf together and are "[f]riendly." (Anthony Depo. 94:8-9, 17-18.)

On March 15, 2006, Defendant Anthony was also reprimanded for sending inappropriate emails to his district colleagues. (Melendez Decl. Ex. N.) On June 12, 2006, Defendant Anthony resigned his position with the District. (Melendez Decl. Ex. WW.)

Melendez claims that, during his employment with the District, he overheard other employees, specifically Rill and Anthony, referring to Hispanic individuals as "gangsters" and "gangbangers." (Melendez Decl. ¶ 17.) Defendants do not dispute this except to point out that Melendez lacks evidentiary support. Rill also allegedly made several racially derogatory statements to Melendez, calling him a "stupid Mexican," and referring to gang members as Melendez's

"brothers." (Melendez Decl. ¶ 18.) Defendant Anthony prohibited Melendez from wearing blue colored clothing or clothing bearing the Los Angeles Dodgers' logo because of its resemblance to "gang memorabilia." (Melendez Decl. ¶ 25.) Other staff members were not subject to this restriction, in particular Eric Harjo, a Caucasian.

Melendez discussed his disability and requested accommodation from Ashbeck. As Melendez testified: "In March or April 2006, I contacted Julie Ashbeck and requested accommodations for my anxiety disorder and insomnia. I informed Ms. Ashbeck that I was taking medication and was under a lot of stress and asked for more time to take the Applied Math section of the test during the coming summer." (Melendez Decl. ¶ 82.) Ashbeck told Melendez the deadline could not be changed. *Id.* On April 14, 2006, Melendez sent a tort claims notice to the District. (Melendez Decl. Ex. PP.)

On April 18, 2006, Melendez was informed that if he did not successfully pass the test by June 9, 2006, he would be terminated. (Bennett Decl. Ex. 15.) On April 21, 2006, Melendez filed an amended tort claims notice. (Melendez Decl. Ex. RR.) On or around June 6, 2006, Melendez spoke with Burrows and requested an extension of this deadline because of anxiety. (Melendez Depo. 285:15-25.) He presented a doctor's note that read: "Patient was seen at the clinic (urgent care) today for his condition (generalized anxiety disorder)." (Melendez Decl. Ex. SS.) No additional extensions were requested by Melendez. (Melendez Depo. 288:5-7.)

On June 8, 2006, Defendant Burrows sent Melendez a letter stating that he would be terminated from employment with the District as of June 9, 2006. (Bennett Decl. Ex. 22.) However, the letter also stated that if Melendez was able to produce a passing math score prior to June 28, 2006, the District would rescind his termination. *Id.* Melendez did not produce a passing score,

request another extension, or seek any further accommodation prior to June 28, 2006, and, thus, his termination was not rescinded. (Bennett Decl., Ex. 23 at ¶ 8.)  In subsequent job applications, Melendez has cited failure to pass the test as the reason for his termination by the District. (Melendez Depo. 332:6-10.)  On June 21, 2006, Melendez was again diagnosed with GAD. (Melendez Decl. ¶ 102.)

On or around September 7, 2006, Melendez filed complaints for employment discrimination and retaliation with the Bureau of Labor and Industries ("BOLI") and the Equal Employment Opportunity Commission.  Melendez filed this action in federal court on June 13, 2007.

Melendez finally passed the test on September 19, 2006. (Bennett Decl., Ex. 25 at 11.)  Since passing the test, Melendez has applied for positions with the District but has never been contacted in response to his applications.  On October 4, 2006, Melendez sent an email to Ashbeck about substitute teaching at District schools and received no response. (Melendez Decl. ¶ 109.)  In April 2007, Melendez applied as an EA within the District and again received no response. (Bennett Decl., Ex. 25 at 8.)  In July 2008, Melendez applied for a District job in response to an online job posting. He was informed that the posting had closed, although there was no indication of a closing date on the posting itself. (Melendez Decl. ¶ 112.)  Defendant Burrows testified that he did not wish to rehire Melendez based on statements Melendez made related to this lawsuit, which Burrows believed to be false. (Burrows Depo. 137:10-138:11.)

*Legal Standard*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) (2008). Summary judgment

is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (2008) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine

OPINION AND ORDER                    13                    {KPR}

issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

1.    Evidentiary Objections

   *a.    Motion Improperly Characterized*

Defendants District and Burrows (for purposes of these objections only, referred to as "Defendants") allege that portions of Melendez's, Elizabeth Melendez's, and Lyons's declarations should be stricken as immaterial or based on inadmissible evidence, or both. This motion has been incorrectly characterized as a motion to strike under Rule 12(f), which authorizes a court to strike material from a pleading. Here, Defendants seek to strike material from an evidentiary submission. Thus, Defendants' motion is properly characterized as a series of evidentiary objections and the court will apply Federal Rule of Civil Procedure ("Rule") 56's standard that admissible evidence be presented on summary judgment.

Defendants specifically object to the following portions of Melendez's declaration. First, Defendants allege that paragraphs 13-18, 20-27, 29, 31-36, 38, 40, 43-47, 49, 50, 52, 54, 60-62, 67, 69, 70, 74, 75, 78, 82, 92-96, 98, 101, and 104 are "substantially comprised of hearsay, speculation, and/or legal conclusions." (Defs.' Memorandum ("Memo.") MSJ I at 2.) Second, Defendants argue that several statements are inadmissible as they relate to events occurring outside the statute of limitations. Third, Defendants allege that paragraphs 24, 38, 50, and 82 of Melendez's declaration contradict earlier sworn testimony given at Melendez's deposition and should not be considered by the court.

//

OPINION AND ORDER                        14                        {KPR}

b.    *Hearsay, Speculation, and Legal Conclusions*

Defendants object to exactly fifty paragraphs contained in Melendez's declaration. Defendants write: "The following paragraphs are inadmissible and should be stricken from the record for purposes of the present Motion for Summary Judgment because they are substantially comprised of hearsay, speculation, and/or legal conclusions." (Defs.' Memo., Motion to Strike at 2.) This statement constitutes the sum total of Defendants' argument as to their broad evidentiary objections to a substantial portion of Melendez's declaration. Defendants also seek to strike the entirety of Elizabeth Melendez and Lyons's declarations on these same grounds. In response, Melendez argues that Defendants objections are too broad and require work on the part of both Melendez and the court that Defendants do not require of themselves.

To the extent that the evidentiary material submitted by either party is speculative or represents a legal conclusion, the court, as a matter of course, will not factor that material into the decision. *See Burch v. Regents of the University of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("[S]tatements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not *facts* and likewise will not be considered on a motion for summary judgment. Objections on any of these grounds are simply superfluous in this context." (citing *Smith v. County of Humboldt*, 240 F. Supp. 2d 1109, 1115-16 (N.D. Cal. 2003) (emphasis in original))). Here, Defendants give an extensive list of objectionable paragraphs in Melendez's declaration and cite three broad objections. Defendants do not specify which objections apply to which paragraphs let alone which particular statements within those paragraphs they apply to. Furthermore, with respect to the declarations of Elizabeth Melendez and Lyons, Defendants object to the declarations in their entirety with no specificity whatsoever.

OPINION AND ORDER                           15                                {KPR}

The court agrees with Melendez and declines to sift through the extensive material cited and speculate as to what material is objectionable and which objection Defendants wish to apply to a particular piece of evidence. *See Burch*, 433 F. Supp. 2d at 1126 n.16 (a party must "identify portions of the *record* that call into question the material facts of [the] case. In the absence of evidentiary support, the court is not obligated to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'" (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989) (emphasis in original))). That said, the court will review the evidentiary submissions and exclude material that is clearly speculative or legally conclusory. Factual allegations that fall into one or more of these categories will not bear on the court's summary judgment analysis. This is analysis implicit in every summary judgment disposition.

Despite their similarly broad nature, the court will specifically address Defendants' hearsay objections. Due to the fact that, at summary judgment, the nonmovant "is not attempting to prove its case, but instead seek[ing] only to demonstrate that a question of fact remains for trial[,]" some circuits evaluate only the moving party's submissions for compliance with the rule against hearsay. *Burch*, 433 F. Supp. 2d at 1121. However, the "current law in the Ninth Circuit is arguably that the rule against hearsay, [Federal Rule of Evidence] 802, applies to evidence submitted in support of *and* in opposition to a motion for summary judgment." *Id.* at 1122 (emphasis in original) (citing *In re Watts*, 298 F.3d 1077, 1083-84 (9th Cir. 2002). The court will address Defendants' hearsay objections, but, because Defendants' hearsay objections were extremely broad and non-specific, the court will address only the portions allegedly containing hearsay that are relevant to disposition of this matter.

First, Melendez's declaration states that Rill told Melendez that "he 'knew for a fact' that

[Melendez] would never get a coaching position at the high school." (Melendez Decl. ¶ 18.) This is an out-of-court statement offered to prove the truth of the matter asserted, i.e., that Melendez was not given a fair opportunity to obtain a coaching position. However, under the Federal Rules of Evidence, admissions are not hearsay. "An admission is an out-of-court 'statement . . . offered against a party.'" Jones, Rosen, Wegner & Jones, *RUTTER GROUP PRACTICE GUIDE: FEDERAL CIVIL TRIALS & EVIDENCE* 8:1996 (The Rutter Group 2008). This rule applies to an employee where the statement is made within both the course and scope of employment. *See Peterson v. Tri-County Metro. Transp. Dist.*, Civ. No. 06-1828-ST, 2008 U.S. Dist. LEXIS 20881, at *9 (D. Or. Mar. 14, 2008) ("Peterson argues that McAuley's statement is not hearsay because it is an admission of a party opponent. . . . To introduce such evidence, Peterson must show that McAuley's statement concerned matters within the scope of her employment and was made during the existence of the employment relationship."). Here, Rill's statement was allegedly made while he was employed by the District and concerns coaching positions given to those employed by the school. However, there is no evidence in the record that Rill was directly involved in hiring coaches or that such activity was otherwise within the scope of his employment. Thus, the statement does not qualify as an admission and is inadmissible hearsay.

Second, Melendez's declaration states that "Mr. Anthony said if there [was] any child abuse that the staff has to report to him, not to the police." (Melendez Decl. ¶ 35.) This statement is offered to prove that Defendant Anthony instructed staff not to go to the police with reports of child abuse, which is what the statement itself asserts. However, it is an admission offered against Defendants and, thus, is not hearsay.

Third, Melendez's declaration states that Defendant Burrows threatened Melendez that "there

would be severe consequences for [him] if [he] did not clean up [his] act and 'keep [his] mouth shut.'" (Melendez Decl. ¶ 38.) Again, this statement is offered to prove that Defendant Burrows told Melendez not to report what was going on at the school. However, it is an admission offered against Defendants and, thus, is not hearsay.

Fourth, Melendez's declaration states that Eric Harjo told him that Defendant Anthony was telling other staff members that Melendez was a "snitch." (Melendez Decl. ¶ 43.) This presents two levels of hearsay because two statements are involved. However, Defendant Anthony's statement is not offered to prove that Melendez is a snitch and is therefore not hearsay. Eric Harjo's statement is offered to prove the truth of his statement, that Defendant Anthony made that particular statement. This comment is within the scope of employment because it concerned important duties related to employment by the District. First, it implicated the duty to report child abuse. Second, it implicated the important act of reporting unlawful discrimination. Third, it implicated Melendez's specific reports about being treated unfairly in his employment. Each of these issues are extremely relevant to the employment context. Defendant Anthony, in his capacity as the principal and Melendez's supervisor, was acting within the scope of his employment when, in the presence of other employees, he referred to Melendez as a "snitch." Communication to Melendez of Defendant Anthony's sentiment by Eric Harjo, a teacher and district employee, does not take it out of the scope of employment. As an employee of the district acting within the scope of his employment, i.e., reporting relevant comments made by the principal, Eric Harjo's statement is an admission and is not hearsay.

Fifth, Melendez's declaration states that Berto Hernandez told Melendez to "get an attorney and file a lawsuit against the District for discrimination and retaliation." (Melendez Decl. ¶ 75.)

OPINION AND ORDER                              18                              {KPR}

This statement is offered for its truth, that a board member of the District believed that Melendez should pursue legal action against the District, from which it presumably can be inferred that Melendez had legitimate grounds upon which to base such action. As a board member, Mr. Hernandez is an agent of the district and, thus, this statement qualifies as an admission. *See Penk v. Oregon State Bd. of Higher Education*, Civ. No. 80-436-FR, 1981 U.S. Dist. LEXIS 17508, at *51 (D. Or. Oct. 9, 1981) ("Title VII's definition of employer is broad in scope; it covers persons with [fifteen] or more employees, engaged in an industry affecting commerce, and any agent of such a person. This term has been construed as covering local school boards which operate numerous schools." (citing 42 U.S.C. § 2000e(b)). The statement is not hearsay.

c.    *Events Occurring Outside the Statute of Limitations*

Defendant next argues that "many of the statements [in Melendez's declaration] are immaterial to any issue before the court because they occurred outside of the applicable statute of limitations and/or do not relate to the elements of any of [Melendez's] claims." *Id.* Defendants apply this same argument to the declarations of Elizabeth Melendez and Lyons.

The court disagrees with Defendants that it cannot consider events outside the statute of limitations, i.e., those taking place more than two years prior to Melendez's filing in federal district court. Although it is true that "time-barred acts may not be considered for purposes of liability, evidence of time-barred acts may be considered to prove timely claims." *Lucke v. Multnomah County*, CV-06-1149-ST, 2008 U.S. Dist. LEXIS 71861, at *64 (D. Or. Sept. 22, 2008); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[T]he statute [does not] bar an employee from using the prior acts as background evidence in support of a timely claim."). Accordingly, the court may consider events taking place prior to June 13, 2005, as background

evidence in support of claims arising after June 13, 2005, although any such incidents do not themselves give rise to liability. And, again, to the extent that the court deems events immaterial, it will exclude them from its consideration of the summary judgment motions before it.

    *d.*    *Conflicts Between Deposition and Declaration Testimony*

Defendants argue that Melendez has submitted declaration testimony that conflicts with prior deposition testimony in an attempt to survive summary judgment by creating sham issues of fact. The Supreme Court has recognized the "virtual unanimity" of circuit courts that "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). In the Ninth Circuit, the general rule is that

> a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony. "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."

*Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (internal citations omitted) (quoting *Foster v. Arcata Associates, Inc.*, 772 F.2d 1453, 1462 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048 (1986)). This rule does not extend to cases "in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony. Rather, [the rule is] concerned with 'sham' testimony that flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment." *Kennedy*, 952 F.2d at 267. Therefore, the district court must determine whether the contradictory testimony was given in an honest effort to clarify, or was an intentional

OPINION AND ORDER          20          {KPR}

alteration designed to create a genuine issue of material fact.

The manner in which courts have treated corrections to depositions, a related issue, sheds light on the proper treatment of a sham affidavit. Rule 30(e) permits corrections to deposition testimony within thirty days of "being notified by the officer that the transcript or recording is available," and where changes are justified by a signed statement "reciting such changes and the reasons given by the deponent for making them." FED. R. CIV. P. 30(e) (2008). In *Hambleton Bros. Lumber Co. v. Balkin Enters.*, 397 F.3d 1217 (9th Cir. 2005), the plaintiff submitted deposition corrections pursuant to this rule, but did not submit the required statement of reasons. The court noted examples where the "deposition corrections are clearly altered to allege facts sufficient to connect [a defendant] where none before existed." *Id.* at 1226 n.6. The court gave the following examples of the plaintiff's original answers and "corrected" answers. Where the plaintiff's original answer read "Personally, I guess he, he didn't breach it," the plaintiff's corrected answer read "I don't know the law but if Mr. Ballinger is responsible for Balkin's actions, then if Balkin breached the agreement, Mr. Ballinger breached the agreement." Where the original answer read "I don't know," the corrected answer read "Mr. Ballinger represented to me in 1996 or 1997 that Balkin still owned the Fruitland property. He acted as if he was still involved with Balkin." Finally, where the original answer again read "I don't know," the corrected answer read, "Ballinger in the dissolution of Balkin distributed assets of Balkin, the Fruitland property, that should not have been distributed, and he made me believe, in the 1996/1997 telephone conversation, that Balkin was still in existence and still owned the Fruitland property, which was untrue." *Id.* The corrected answers were clearly in conflict with the answers originally given at the deposition, especially as to those questions to which the plaintiff had answered "I don't know."

In response to these proffered "corrections" and in the absence of an explanation for these

corrections, the court wrote:

> A statement of reasons explaining corrections is an important component of errata submitted pursuant to FRCP 30(e), because the statement permits an assessment concerning whether the alterations have a legitimate purpose. The magistrate judge was troubled by the deposition corrections' seemingly tactical timing . . . . The absence of any stated reasons for the changes supports the magistrate judge's concern that the 'corrections' were not corrections at all, but rather purposeful rewrites tailored to manufacture an issue of material fact regarding Ballinger and to avoid a summary judgment ruling in his favor.

*Id.* at 1224-1225. The court likened this treatment of "sham" corrections to its treatment of "sham"

affidavits in *Kennedy.* In other words, in order to accept an alteration or correction of deposition

testimony via a supplemental affidavit, the court must be persuaded that the changes had a legitimate

basis, i.e., the testimony required clarification, the deponent genuinely misunderstood the question,

or the deponent gained access to new evidence containing material facts. *See Kennedy*, 952 F.2d

at 266 (quoting *Miller v. A.H. Robins Co.*, 766 F.2d 1102, 1104 (7th Cir. 1985)).

Judges in this district have applied this standard to assess the legitimacy of corrected

testimony. In *B.J.G. v. Society of the Holy Child Jesus*, Civ. No. 07-541-HA, 2008 U.S. Dist. LEXIS

25227 (D. Or. Mar. 28, 2008), the plaintiff alleged sexual abuse by nuns more than forty years prior

to filing her claim in federal court. Whether the plaintiff's claims were time-barred was dependent

on the time at which she became aware that she had suffered legally cognizable harm. The plaintiff

submitted a corrected deposition and the defendants moved to strike "plaintiff's amended and

'corrected' answers to her deposition, which alter[ed] plaintiff's testimony regarding when she knew

of the impact upon her from the nuns' alleged abuse . . . ." *Id.* at *2. In her deposition, the plaintiff

testified that "she actually knew that what she [said] the sisters did to her had contributed to her

bouts of depression long before she finally filed her complaint." *Id.* at *6. The plaintiff, by way of a corrected deposition, attempted to alter this testimony and assert that she "[did] not know when she became cognizant that the alleged abuse at issue contributed to her depression . . . ." *Id.* Plaintiff's counsel argued that the corrections were necessary because "plaintiff was pressured for answers that she was unsure of at her deposition and that when pushed, plaintiff was compelled to guess." *Id.* Judge Haggerty concluded that this allegation was not supported by the record and, therefore, the changes made to the transcript were unjustified. Accordingly, the motion to strike was granted.

By contrast, in a recent decision also in this district, Judge Papak denied the plaintiffs' motion to strike deposition testimony based on alleged inconsistencies. The testimony in question dealt with whether the parties were in compliance with an organizational rule. The court determined that, although the deponent "was less well prepared for his deposition than he would have been under ideal circumstances, and therefore could give no definitive response as to the two plaintiff organizations' current compliance with the Program Integrity Rule, such ill-preparedness [was] not a basis for granting the motion to strike." *Legal Aid Servs. of Oregon v. Legal Servs. Corp.*, CV 05-1444-PK, 2008 U.S. Dist. LEXIS 28887, at *43 (D. Or. Apr. 7, 2008). Further, "[b]eyond [the deponent's] inability to answer questions regarding current compliance, comparison of the relevant portions of his deposition testimony and the complained of paragraphs of his declaration reveal[ed] no contradiction." *Id.* at *44. Where a court can reasonably reconcile the alleged inconsistencies, a motion to strike should be denied.

Defendants object to four instances in which Melendez's declaration allegedly contradicts his deposition testimony. First, Defendants cite paragraph 24 of Melendez's declaration as

OPINION AND ORDER                    23                    {KPR}

conflicting with his deposition testimony at 272:6-274:5. Defendants claim these are contradictory because at deposition Melendez testified that the District's first notice of his medical condition occurred in June 2006, immediately prior to his termination for failure to pass the test. Melendez's declaration, however, states that Melendez requested an accommodation from Chavez for anxiety and insomnia, within a year of September 30, 2004. Melendez responds that this is not a "flat contradiction" and, thus, it is not subject to the sham affidavit rule. Analysis under this rule is not simply concerned with the existence of a direct contradiction. Rather, the rule addresses a range of inconsistencies and whether such inconsistencies can be explained or otherwise resolved. Here, Melendez offers no rationale for his testimonial inconsistency outside of observing that the human memory is falliable. This is not sufficient to explain the inconsistency between Melendez's deposition and declaration testimony.

However, the portion of the deposition cited by Defendants does not address the issue as characterized by Defendants and, thus, does not actually contradict the declaration testimony. Instead, it addresses whether or not Melendez signed a note and delivered it, with a doctor's note, to the superintendent's office. Melendez does not testify, in this excerpt cited by Defendants, that this was the first notice he gave of his medical condition to Defendants. The court recognizes that this deposition excerpt is not on point and that Defendants may have cited it in error. But, under the Local Rules of Civil Practice, "[e]xcept as otherwise required by law, when resolving a motion for summary judgment, the [c]ourt has no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties." *District of Oregon, Local Rules of Civil Practice*, Rule 56.1 (2006). The court declines to locate the deposition excerpt it assumes Defendants intended to cite. Thus, the could will not strike the cited portion of

Melendez's declaration.

Second, Defendants cite paragraph 38 of Melendez's declaration as conflicting with his deposition testimony at 221:23-222:21.  Defendants claim these are contradictory because at deposition, Melendez testified that Defendant Burrows asked him only to delete specific emails, whereas paragraph 38 of Melendez's declaration states that Defendant Burrows told him to shred all papers and email and empty the "trash" folders on his computer. The court declines to strike this testimony for two reasons. First, the deposition excerpt cited by Defendants is not included in either party's briefing materials and, thus, the court could not review the actual content of that excerpt. Second, the court is not persuaded that it "flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment." *Kennedy*, 952 F.2d at 267.  The differences in the testimony are minor and do not materially alter the meaning of Melendez's testimony.

Third, Defendants cite paragraph 50 of Melendez's declaration as conflicting with his deposition testimony at 253:2-7.  Defendants claim these are contradictory because at deposition, Melendez was asked to list all incidents of harassment and Melendez did not list the incident described in paragraph 50 wherein a cafeteria employee took a french fry off the floor and put it on Melendez's plate. Again, the deposition excerpt cited by Defendants is not included in either party's briefing materials and, thus, the court could not review the actual content of that excerpt.  Because of this omission, the court cannot evaluate whether Melendez should have included the incident in his deposition testimony.   Accordingly, the court will not strike this portion of Melendez's declaration testimony.

Fourth, Defendants cite paragraph 82 of Melendez's declaration as conflicting with his deposition testimony at 288:5-7.  Defendants claim these are contradictory because at deposition,

Melendez testified that his first request for accommodation occurred in June 2006 when Melendez showed Defendant Burrows his doctor's note, immediately prior to the testing deadline. Paragraph 82 of Melendez's declaration states that Melendez contacted Ashbeck in March or April 2006 to request accommodations related to the test and was told that the deadline could not be changed. However, Defendants mischaracterize Melendez's deposition testimony, which actually states that Melendez did not present additional doctor's notes to Defendant Burrows for extensions of time. Thus, these two propositions are not in conflict as the declaration says nothing about a doctor's note. The deposition testimony cited simply does not say that Melendez's first and only request for accommodation occurred when he presented his doctor's note to Defendant Burrows immediately prior to the testing deadline. Accordingly, this portion of Melendez's declaration will not be stricken.

    *e.*    *Marital privilege*

The marital communications privilege "provides that 'communications between the spouses, privately made, are generally assumed to have been intended to be confidential, and hence they are privileged . . . .'" *United States v. Montgomery*, 384 F.3d 1050, 1056 (9th Cir. 2004) (quoting *Wolfe v. United States*, 291 U.S. 7, 14 (1934)). The privilege applies to legally married persons and extends to "words and acts intended to be a communication," so long as those communications were not made in the presence of a third party, or likely to be overheard by a third party. *Montgomery*, 384 F.3d at 1056. Thus, Elizabeth Melendez may assert this privilege regarding communications she had with her husband, Melendez. Elizabeth Melendez's deposition reveals that she invoked the marital privilege as to all communications between Melendez and herself.

Defendants object that, despite her earlier reliance on the marital privilege, Elizabeth

OPINION AND ORDER          26          {KPR}

Melendez references communications between herself and her husband in her declaration. This is objectionable because at deposition Defendants had the opportunity to cross-examine Elizabeth Melendez, but with a declaration, Defendants have no such opportunity. However, there is no bar to invoking a privilege in the first instance and later waiving the privilege, so long as there is no prejudice shown; Defendants offer no such argument. Also, Defendants never moved to compel the testimony for which Elizabeth Melendez claimed the marital privilege. Further, the content of Elizabeth Melendez's declaration is not outcome-determinative as to the existence of any genuine issue of material fact. Thus, Defendants will not be prejudiced by Elizabeth Melendez's inconsistent invocation of this privilege.

### f.    *Defendant Anthony's evidentiary objections*

In his reply brief to his motion for summary judgment, Defendant Anthony objects to eight factual allegations advanced by Melendez in his response brief. As a preliminary matter, Melendez argues that these objections should have been filed as a formal motion under Federal Rule of Civil Procedure 7(b) and Local Rule 7.1(b), which stand for the proposition that a request for a court order must be made by motion and may not be combined with other documents, respectively. However, the parties may raise admissibility objections in their summary judgment materials. *See Kesey, LLC v. Francis*, CV. 06-540-AC, 2009 U.S. Dist. LEXIS 28078, at *47 (D. Or. Apr. 3, 2009) (though the objections were raised in the parties' summary judgment briefing, "the court still must determine whether the evidence the parties offer meets the admissibility standards [of] Rule 56(e)."). Rule 56 states, in relevant part:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit,

a sworn or certified copy must be attached to or served with the affidvait.

FED. R. CIV. P. 56(e)(1) (2009). Thus, Defendant Anthony may argue that the evidence proffered by Melendez is inadmissible and the court may address these factual disputes here, prior to analyzing Defendant Anthony's motion for summary judgment.

### i.    First disputed factual allegation

Defendant Anthony objects to this statement from Melendez's response brief:  "It is undisputed that Plaintiff alleges he was transferred, in retaliation for making a complaint child abuse [sic] and complaints over offensive emails, in December of 2005." (Pl.'s Response Memo. to MSJ II at 3.)  According to Defendant Anthony, there is no factual support for this allegation and it contradicts Melendez's sworn deposition testimony.  As a preliminary observation, the court points out that the statement includes the term "alleges."  Melendez may allege whatever he wants and here he presents this statement as an allegation, not a fact.  That said, the court agrees with Defendant Anthony that the underlying statement remains disputed.  Melendez has testified that he did not wish to be transferred, that he told Chavez that he did not wish to be transferred, and that Chavez and Defendant Burrows informed him of his transfer and told him he would be fired if he failed to show up for his new position.  In addition, whether or not Melendez was retaliated against remains disputed and is, in part, the subject of the motions for summary judgment.  Melendez's statement that his transfer was in retaliation for protected activity is, on his part, a legal conclusion.  Whether or not Melendez's retaliation claim may proceed to trial will be taken up by the court below and, to the extent Melendez has offered a legal conclusion, such conclusion will be rejected.

### ii.    Second disputed factual allegation

Defendant Anthony's second factual objection applies to Melendez's statement that he

alleges retaliation based on child abuse reporting and sexually explicit emails. Again, an allegation

differs from a statement purporting to set forth a material fact. Further, the court deems this "fact"

as a legal conclusion.

### iii.    Third disputed factual allegation

Defendant Anthony objects to Melendez's claim in his response brief that he did not receive

"good faith" consideration for a position coaching soccer and the extra wages such a position would

bring, citing paragraph 36 of his declaration. This paragraph states that he inquired about the

coaching position but was rebuffed by Defendant Anthony's terse response. According to Defendant

Anthony, Melendez's characterization is inaccurate and unsupported by his declaration. Defendant

Anthony also objects on the ground that good faith involves subjective intent, which is something

that cannot be proven by the factual assertions of another.

Melendez is entitled to promote his interpretation of events and draw inferences he feels are

reasonable based on the evidentiary record. The court is responsible for evaluating the inferences

of both parties and determining which are supported by the evidence before it, subject to the standard

for summary judgment. Defendant Anthony's objection is noted, but Melendez's characterization

does not merit exclusion from the record.

### iv.    Fourth disputed factual allegation

Defendant Anthony objects to Melendez's claim he was told by a teacher that staff members

were told by Defendant Anthony that Melendez was a "snitch" and they should not speak to him for

that reason. As stated previously, *see supra* at 17, this statement does not violate the rule because

it qualifies as an admission. Thus, this allegation is not stricken.

//

OPINION AND ORDER                              29                                    {KPR}

v.    Fifth disputed factual allegation

This factual allegation concerns the extent to which Melendez was required to lift and stack tables when Defendant Anthony put him on cafeteria duty. In his response brief he states that only a week after he was released from the hospital, Defendant Anthony ordered him to lift tables in the cafeteria. In his deposition testimony, Melendez stated that students in detention would assist him on cafeteria duty and he supervised them lifting the tables and putting them away. Defendant Anthony argues that this portion of Melendez's testimony should be stricken as sham testimony. Melendez argues that this is not a flat contradiction; it is, at worst, an inconsistency. The court may accept inconsistent testimony where it can reasonably reconcile the inconsistencies. Here, Melendez gives no rationale for the inconsistency, and claims only that the are not diametrically opposed. This does not cure the inconsistency. Rather, the court recognizes that there is a material difference between Defendant Anthony ordering Melendez to lift and stack tables shortly after being released from the hospital and ordering Melendez to supervise others lifting and stacking tables. Defendant Anthony is correct that these two evidentiary submissions are directly at odds with one another on that point and, thus, Melendez's allegation is stricken.

Melendez also cited to a portion of Defendant Anthony's deposition. Defendant Anthony objects to use of this deposition testimony because the document is presented as an unauthenticated draft transcript that cannot be cited to or relied on by the court. In the Ninth Circuit, "[a] deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent." *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 774 (9th Cir. 2002) (citations omitted). An affidavit of counsel that attests to the excerpt's

OPINION AND ORDER                                30                                {KPR}

authenticity is insufficient, "even if the affiant-counsel w[as] present at the deposition." *Id.*

Here, the deposition excerpt is attached to the declaration of Daniel Snyder, who attests that it is a "true and correct cop[y] of a rough draft of the deposition transcript of Ronald Anthony." (Snyder Decl. 2.) Under *Orr*, this is insufficient authentication and the deposition excerpt cannot support Melendez's contention. Melendez, in responding to these objections, has attached the official transcript of Defendant Anthony's deposition and seeks to substitute these for the draft copies previously submitted. Melendez argues that because Defendant Anthony was provided with a draft copy, he was not prejudiced by submission of the draft transcript. The court need not decide, however, whether it will admit it the draft copy, because it finds that the unexplained inconsistency in the testimony justifies striking the testimony from the evidentiary record, for purposes of this motion.

> vi.    Sixth disputed factual allegation

This disputed factual allegation concerns communication between Melendez, Defendant Anthony, and French. In his response brief, Melendez claims that Defendant Anthony told him he would talk to French about hiring Melendez as a coach, but that Defendant Anthony never fulfilled this promise. The factual support in Melendez's declaration states only that French never contacted Melendez and expresses no opinion as to whether Defendant Anthony ever spoke to French. This is at odds with Melendez's claim that Defendant Anthony was dishonest with him when he stated he would talk to French. Again, Melendez is entitled to interpret the record and draw favorable inferences that support his position. This inference is reasonably based on the record and does not justify striking the underlying portion of the declaration.

//

vii.    Seventh disputed factual allegation

This dispute involves a negative performance evaluation Melendez received from Defendant Anthony regarding his communication skills as an assistant basketball coach. Defendant Anthony argues that Melendez drew an inappropriate inference from two facts: first, that he played a role in reporting child abuse by head basketball coach Fred Long and, second, that he received a negative performance rating for his failure to communicate with Mr. Long. From these facts, Melendez infers that the negative performance evaluation was in retaliation for reporting Mr. Long's child abuse. Melendez suggests that the report could not have been justified because he reported an incident of abuse and, therefore, was unable to communicate effectively with Mr. Long.

Furthermore, Defendant Anthony argues, Melendez's deposition testimony states that after November 30, 2005, he had no official contact with Defendant Anthony, except for an occasional greeting in the hallway. Melendez now states that Defendant Anthony acted inappropriately when he gave him a negative performance evaluation that was not justified under the circumstances. Melendez argues that the deposition and declaration do not flatly contradict and thus the declaration testimony should not be stricken. Defendant Anthony replies that this is an unexplained restoration of memory which violates the rule against sham affidavits.

First, Melendez is entitled to advance his position by arguing favorable inferences based on the evidentiary record, which his submitted testimony does appropriately. Defendants' objection is duly noted. Second, Defendants' objection to testimony regarding Defendant Anthony's contact with Melendez following his transfer ignores the distinction between in-person official contact and an evaluation of Melendez prepared by Defendant Anthony. The court does not consider these two propositions sufficiently contradictory to justify striking them from the record.

### viii.    Eighth disputed factual allegation

Defendant Anthony objects to Melendez's claim that Defendant Anthony recommended eliminating his wife's position at the May 8, 2006, school board meeting. This allegation is contradicted by Elizabeth Melendez's declaration testimony which states that certain persons "on friendly terms" with Defendant Anthony recommended eliminating the home school liaison program. She does not allege that Defendant Anthony himself called for eliminating her position. Thus, Defendant Anthony argues, it is clear that neither Elizabeth Melendez nor her husband have personal knowledge as to whether Defendant Anthony was involved in the decision to eliminate the home school liaison program.

Defendant Anthony is correct that the two declarations are at odds as to who suggested eliminating Elizabeth Melendez's position at the meeting. However, because they are the testimony of two individuals, rather than a single individual's conflicting testimony, they are not subject to the rule governing the treatment of sham affidavits. The fact that Melendez and his wife gave differing accounts as to who said what at the meeting does not justify striking their testimony.

### ix.    Objections to Elizabeth Melendez's declaration

Defendant Anthony further objects to the content of Elizabeth Melendez's declaration as including both inadmissible hearsay and information previously withheld under the marital communications privilege. As above, the court will explicitly address only those instances of hearsay that are relevant to the current motions. However, there are no instances of hearsay sufficiently relevant to the current motions to merit specific mention in this disposition. As for the marital privilege issues, Elizabeth Melendez's prior invocation of the marital privilege is immaterial because, to the extent she describes communications between she and her husband in her declaration,

their content is not outcome-determinative of this motion.

        **x.**        <u>Defendant Anthony's request for factual findings pursuant to Rule 56(d)(1)</u>

Defendant Anthony "requests that the [c]ourt make findings as to the material facts at issue."

(Def. Anthony Reply Memo. 19.)  Rule 56(d)(1) states:

> If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue.  The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys.  It should then issue an order specifying what facts—including items of damages or other relief—are not genuinely at issue.  The facts so specified must be treated as established in the action.

FED. R. CIV. P. 56(d)(1) (2009).  This allows the court to "enter[] summary judgment upon one or more issues of fact found not to be genuine or material." *Archer v. United States*, 217 F.2d 548, 550 n.5 (9th Cir. 1954).  These findings will be made at the end of this opinion in the "Undisputed Material Facts" section.

**2.**      <u>MSJ I – Claims Against the District</u>[1]

The District moves for summary judgment on all claims, specifically claims arising under the ADA, Title VII, section 1983, and associated state law claims.

    *a.*    *Discrimination based on disability:  the ADA and ORS 659A.100*

The American with Disabilities Act of 1990 (42 U.S.C. §12201) ("the ADA") prohibits covered employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. §12112(a).  The ADA defines "qualified individual with a

---

[1] Melendez stipulated in his response memoranda that he was asserting only § 1983 claims against Defendants Burrows and Anthony in their individual capacities.

OPINION AND ORDER          34          {KPR}

disability" as an "individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8); 29 C.F.R. §1630.2(m).  In order to prevail on an employment discrimination claim under the ADA, a plaintiff must establish that: (1) the plaintiff is a disabled person within the meaning of the ADA; (2) the plaintiff is able to perform the essential functions of the job, with or without reasonable accommodation (which the plaintiff must describe); and (3) the employer terminated the plaintiff because of the disability.  *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999).

The standard for establishing a prima facie case under the Oregon disability statutes is the same as under the analogous ADA provision. *See Wheeler v. Marathon Printing, Inc.*, 157 Or. App. 290, 301 n.6, 974 P.2d 207 (1998) (noting that the Oregon statutory scheme regarding workplace discrimination against disabled persons "contain[s] language significantly similar to the ADA"); *see also* ORS 659A.139 ("O.R.S. 659A.112 to 659A.139 shall be construed to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990, as amended.").

    i.    Disability

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1) (2008). The regulations define "substantially limited" as:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as

OPINION AND ORDER         35         {KPR}

compared to the condition, manner, or duration under which the average person in
the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). Three factors are to be considered in determining whether an individual

is substantially limited in a major life activity: (1) the nature and severity of the impairment; (2) the

duration or expected duration of the impairment; and (3) the permanent or long-term impact, or

expected permanent or long-term impact of or resulting from the impairment.   29 C.F.R.

§1630.2(j)(2).

Here, Melendez alleges that anxiety, diagnosed as GAD, and depression are impairments that

substantially limit his ability to sleep, a major life activity.  Courts have recognized that a disruption

in sleep may give rise to a disability protected under the ADA. *See Traxler*, 2008 U.S. Dist. LEXIS

at *25 ("Sleeping is a major life activity.").  In *Head v. Glacier Northwest Inc.*, 413 F.3d 1053, 1060

(9th Cir. 2005), the Ninth Circuit held that a sleeping impairment may constitute a substantial

limitation in a major life activity.  The plaintiff in *Head* complained of sleeping only five or six

hours a night with medication, sometimes sleeping not at all, of "passing out" immediately after

returning home from work, and of suffering drowsiness throughout the day as a result of lack of

sleep and medications.  This was sufficient to present a genuine issue of material fact as to whether

the plaintiff was disabled for purposes of the ADA.

The record evidence discloses that Melendez has both been diagnosed with and treated for

anxiety and depression since 2001. *See supra* at 1-2.  Melendez was hospitalized for anxiety and

insomnia on four occasions; one hospitalization lasted for four days. *Id.* at 3,6.  Melendez claims

that these conditions negatively impact his ability to sleep such that he is only able to sleep three or

four hours a night. *Id.* at 6.  Melendez also claims that his anxiety condition contributed to his

OPINION AND ORDER                              36                                    {KPR}

failure to pass the test. *Id.* at 8. In March 2006, Melendez was diagnosed with GAD and prescribed Zoloft for his anxiety and sleeping difficulties. *Id.* at 8. Melendez presented a note, on June 1, 2006, stating that he had been seen that day in urgent care for his condition, GAD. *Id.* at 10. Therefore, Melendez has presented sufficient evidence to raise a genuine issue of material fact as to whether he was disabled by an inability to sleep sufficient to qualify for protection under the ADA.

      ii.    Qualified

To meet his prima facie burden, Melendez must also present a genuine issue of material fact that he was qualified for his position. "A 'qualified individual' is 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Bates v. UPS*, 511 F.3d 974, 989 (9th Cir. 2007) (citing 42 U.S.C. § 12111(8)). Where passage of a test is required for continued employment, the employer must establish that "the qualification standard is (1) 'job related,' (2) 'consistent with business necessity,' and (3) that 'performance cannot be accomplished by reasonable accommodation.'" *Id.* at 995.

There is no dispute that, outside of the testing requirement established by the No Child Left Behind Act, Melendez was qualified to perform his job duties. *See* Melendez Decl. Exs. A-D, I (performance reviews establishing that Melendez was consistently evaluated as capable of performing his job). The District argues that if Melendez was unable to meet the certification requirements set forth under federal regulations and District policy, then he cannot be found qualified as a matter of law. However, Melendez claims that he was prevented from qualifying for his position, i.e., passing the test, by the District's refusal to reasonably accommodate his testing needs. Therefore, there is a genuine issue of material fact as to whether, with reasonable accommodation,

Melendez would have been able to pass the test and, thus, perform the essential functions of his job.

### iii.    Causation

Melendez must also demonstrate a genuine issue of material fact as to whether he suffered an adverse employment action because of his disability. Melendez claims that he requested accommodation of his anxiety from Chavez in September 2004. In March or April 2006, Melendez alleges that he asked Ashbeck for an extension of the testing deadline because he suffered from insomnia. Melendez also asked Defendant Burrows for an extension of the testing deadline because of his anxiety on June 6, 2006. The record does not include any evidence that Melendez's requests for accommodation were considered. Thus, there is at least a genuine issue of material fact that Melendez requested testing accommodations, that these accommodations should have been addressed and provided, and that the District's failures to accommodate Melendez prevented him from passing the test. The District's motion for summary judgment on this claim is denied.

### b.    *Race and National Origin Discrimination: Title VII and ORS 659A.030*

Melendez has alleged unlawful workplace discrimination based on race and national origin under two theories: disparate treatment and retaliation. The court will address each in turn.

### i.    Disparate Treatment

As the Supreme Court stated in *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003), "disparate treatment . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or [other protected characteristic]." (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (internal quotation marks omitted)). Melendez alleges that the District treated him differently than other employees because of his race and national origin. This presents a claim of disparate

treatment, in violation of Title VII and Oregon law.

"In order to withstand summary judgment on [a] disparate treatment claim, [a] plaintiff may either demonstrate a triable issue based on direct or circumstantial evidence that he was the target of intentional . . . discrimination, or he may make his case under the *McDonnell Douglas* framework." *Courtney v. Oregon Dept. of State Police*, Civ. No. 06-6223-TC, 2008 U.S. Dist. LEXIS 53282, at *30-31 (D. Or. July 11, 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). In this case, the parties have relied on the burden-shifting framework set forth in *McDonnell Douglas*.

"Under *McDonnell Douglas*, a plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination. Specifically, the plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably." *Chaung v. Univ. of California Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000) (internal citation omitted). "The requisite degree of proof necessary to establish a *prima facie* case for a Title VII claim on summary judgment 'is minimal and does not even need to rise to the level of a preponderance of the evidence.'" *McNack v. Warren*, Civil No. 99-1211-KI, 2000 U.S. Dist. LEXIS 14381, at *13 (D. Or. Sept. 29, 2000) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)). "The plaintiff need only offer evidence which 'gives rise to an inference of unlawful discrimination.'" *Wallis*, 26 F.3d at 889 (quoting *Lowe v. City of Monrovia*, 775 F.2d 998, 1007 (9th Cir. 1985)).

Once a plaintiff has made his prima facie showing of discrimination, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's

rejection." *McDonnell Douglas*, 411 U.S. at 802.  *See also Knox v. City of Portland*, 543 F. Supp. 2d 1238, 1247 (D. Or. 2008) ("If plaintiff makes a prima facie case, the burden of production then shifts to the employer to articulate some legitimate, non-discriminatory reason for the adverse employment action." (citing *Chaung v. Univ. of Cal.*, 225 F.3d 1115, 1123-1124 (9th Cir. 2000))). If the defendant successfully gives such a reason for the employment action, the plaintiff must then demonstrate that the proffered reason is pretextual.  *Chaung*, 225 F.3d at 1124.  Pretext may be established in one of two ways:  "(1) indirectly by showing that defendant's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable; or (2) directly, by showing that unlawful discrimination more likely motivated the defendant." *White v. TA Operating Corp.*, Civil No. 06-1747-AA, 2008 U.S. Dist. LEXIS 48103, *8-9 (D. Or. June 19, 2008) (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998)).

For a claim arising under ORS 659A.030, where the federal court has supplemental jurisdiction, the plaintiff need only make a prima facie showing of discrimination to survive summary judgment.  *See Adams v. Home Depot USA, Inc.*, Civ. No. 05-ST-1798-ST, 2007 WL 4565163, at *16 (D. Or. Dec. 19, 2007) ("a plaintiff who establishes a *prima facie* case of discrimination under Title VII or ADEA survives summary judgment on the corresponding discrimination claim under ORS 659A.030 without having to satisfy the next steps of the *McDonnell Douglas* framework."). This rule does not hold where the court has diversity jurisdiction, however, as the Ninth Circuit held in *Snead v. Metropolitan Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1091 (9th Cir. 2001). *See Adams*, 2007 WL 4565163, at *17 ("*Snead* holds that federal courts with diversity jurisdiction must apply the *McDonnell Douglas* burden-shifting framework to claims under ORS 659A.030."). *Snead* does not apply to claims in federal court based on supplemental jurisdiction.

*Id.* In this case, the court has supplemental jurisdiction over Melendez's state law discrimination claim and, thus, Melendez needs only establish the prima facie elements of a Title VII claim to survive summary judgment.

### A.    *Prima Facie Burden*

Melendez meets his prima facie burden under the *McDonnell Douglas* framework as his evidence creates a genuine issue of material fact on each of the required elements. First, Melendez was born in Mexico and is Hispanic. Although he is a legal resident of the United States, he is not a citizen. Therefore, Melendez is a member of two protected classes, those of race and national origin. Second, for the duration of his employment with the District, Melendez was qualified for his position. Third, Melendez was subjected to three adverse employment actions occurring within the statute of limitations when he was involuntarily transferred, terminated, and subsequently not rehired. Fourth, other non-Hispanic employees were treated more favorably than Melendez. Because Melendez meets his prima facie burden, the District's motion for summary judgment on Melendez's ORS 659A.030 claim is denied.

### B.    *Legitimate Non-Discriminatory Reason*

Because Melendez met his prima facie burden to demonstrate disparate treatment under the federal framework, the District is required to proffer a legitimate, non-discriminatory reason for the adverse employment action. The District states that Melendez was transferred because he was the most qualified EA for that position and was terminated because he failed to pass the test. The District does not provide a legitimate non-discriminatory reason for its failure to rehire Melendez.

### C.    *Pretext*

Melendez maintains that the District's proffered reasons are merely pretextual. First,

OPINION AND ORDER                            41                            {KPR}

Melendez tried for years to get a coaching position with the school, but all such positions were given to other staff members. Melendez recalls an instance when a Caucasian man who had just graduated from high school was hired for a coaching position over Melendez. Second, Melendez was the only EA required to perform janitorial tasks while on cafeteria duty. Once, when he refused to perform these tasks, a Caucasian cafeteria worker took a french fry off the ground and placed it on Melendez's plate. When Melendez reported this behavior, Defendant Anthony spoke to the employee, but did not otherwise punish her. Third, Melendez was the only employee involuntarily transferred to the alternative school, despite having communicated that he did not wish to be transferred. Fourth, Melendez was personally barred from wearing clothing that might be viewed as gang-related while Caucasian employees were allowed to wear similar clothing.

Despite Melendez's earlier belief and representations that the treatment he complained of was not racial discrimination, there is a genuine issue of material fact that he experienced disparate treatment. The District provides no evidence that Melendez was the only EA qualified for the transfer. The District also claims that Melendez was terminated for failure to pass the test, but there is a genuine issue of material fact as to whether the District failed to accommodate Melendez's disability in taking that same test. If Melendez was the victim of racial discrimination, this failure to accommodate may also stem from that racial animus. The District provided no rationale for its failure to rehire Melendez. Thus, there is a genuine dispute as to whether the adverse employment actions occurred for legitimate or discriminatory reasons. Accordingly, the District's motion for summary judgment on Melendez's Title VII disparate treatment claim is denied.

      ii.    Retaliation

Melendez also alleges that he was retaliated against after voicing complaints of

discrimination based on his race and national origin and in violation of Title VII. Chapter 42 of the

United States Code, section 2000e-3 states, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against
> any of his employees or applicants for employment . . . because he has opposed any
> practice made an unlawful employment practice by [Title VII], or because he has
> made a charge, testified, assisted, or participated in any manner in an investigation,
> proceeding, or hearing under [Title VII].

42 USCS § 2000e-3. This provision of Title VII "protects the right to be free from certain types of

forbidden discrimination, as well as the right to speak out against such discrimination. It also

protects against retaliation for the exercise of the right to speak out against discrimination."

*Hernandez*, 343 F.3d at 1113.

The *McDonnell Douglas* framework also governs retaliation claims arising under Title VII.

*See Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1140 (9th Cir.

2001) ("We apply a system of shifting burdens in Title VII discrimination and retaliation cases."

(citing *McDonnell Douglas*, 411 U.S. at 802-803)). "A plaintiff may establish a *prima facie* case

of discriminatory retaliation by showing that: (1) she engaged in a protected activity; (2) she was

subjected to an adverse employment action; and (3) there was a causal link between the protected

activity and the adverse employment action." *Jamal v. Wilshire Mgmt. Leasing Corp.*, 320 F. Supp.

2d 1060, 1078 (D. Or. June 10, 2004) (citing *Bergene*, 272 F.3d at 1141). "If the plaintiff establishes

a *prima facie* case, '[t]he *McDonnell Douglas*' order and allocation of proof that governs disparate

treatment claims also governs retaliation claims.'" *Kitchen v. WSCO Petroleum Corp.*, 481 F. Supp.

2d 1136, 1144 (D. Or. Jan. 29, 2007) (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir.

1987), *cert. denied* 498 U.S. 939 (1990)). As above, if Melendez can meet his prima facie burden,

the District must proffer a legitimate, nondiscriminatory reason for the adverse employment action.

If the District can produce such a reason, Melendez then has the opportunity to rebut that reason as a mere pretext for the adverse action. Also, if Melendez meets his prima facie burden under Title VII, his retaliation claim under Oregon law will survive summary judgment.

> ### A.    Prima Facie Burden

Melendez must first establish that he engaged in protected activity, that is, he has complained about activity made unlawful under Title VII or has participated in "an investigation, proceeding, or hearing," pursuant to Title VII. 42 U.S.C. § 2000e-3(a). According to Melendez, he complained to Defendant Anthony that Rill made derogatory comments about Hispanic student football players. He also complained to Defendant Anthony about the cafeteria employee who put food from the floor onto his plate, which he felt was a derogatory comment on his race. In August 2005, Melendez complained to Chavez that he was being discriminated based on race. Melendez also claimed discrimination in his BOLI complaint. Thus, Melendez has presented a genuine issue of fact as to whether he engaged in activity protected under Title VII.

The second prima facie element Melendez must establish is that he was subjected to an adverse employment action. It is clear from the record that the District involuntarily transferred, terminated, and failed to rehire Melendez. These are all adverse employment actions and, thus, the second prong is met.

The third prima facie element Melendez must establish is a causal connection between the protected activity and the adverse employment action or actions. Melendez has presented sufficient evidence of racial animus in the District and opposition to Melendez engaging in protected activity to create an inference that the adverse employment actions were in retaliation for such activity. Because Melendez has made his prima facie case under Title VII, the District's motion for summary

OPINION AND ORDER                    44                              {KPR}

judgment on his state law retaliation claim is denied.

Proceeding under the *McDonnell Douglas* framework for the federal claim, the District claims legitimate, nondiscriminatory reasons for the involuntary transfer and termination. However, there are genuine issues of material fact as to whether these reasons are legitimate or pretextual. Melendez has presented substantial evidence that he was the victim of race and national origin based discrimination, that he had reported this discrimination several times, and that such behavior had earned him a negative reputation amongst some administrators and staff. This evidence is sufficient to support an inference that the reasons given were pretextual. Thus, there is at least a genuine issue of material fact as to whether Melendez was retaliated against for engaging in conduct protected by Title VII. The District also claims that failure to rehire was not alleged and, thus, they need not give a legitimate, nondiscriminatory reason for it. On this point, the District is incorrect. In his complaint, Melendez alleged both disparate treatment and retaliation claims under Title VII, and although he did not specify which adverse employment actions he claimed gave rise to the harms, he did allege that he had been wrongly transferred, terminated, and not rehired. Therefore, there is a genuine issue of material fact as to whether the District failed to rehire Melendez in violation of Title VII and the District's motion as to this claim is denied.

   c.    *Whistleblower Claim*

Melendez alleges a claim under Oregon's whistle-blower statute. Under Oregon law:

> It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported criminal activity by any person, has in good faith caused a complainant's information or complaint to be filed against any person, has in good faith cooperated with any law enforcement agency conducting a criminal investigation, has in good faith brought a civil proceeding

OPINION AND ORDER                      45                      {KPR}

against an employer or has testified in good faith at a civil proceeding or criminal trial.

OR. REV. STAT. 659A.230 (2007). Citing this statutory section, the Ninth Circuit has noted that "[t]he clear purpose of the whistle-blower statute is to protect employees who initiate or aid in a civil or criminal proceeding." *Ransom v. HBE Corp.*, 73 Fed. Appx. 919, 921 (9th Cir. 2003). This protection extends to internal complaints, but only those that "further the statutory goal of initiating a civil or criminal proceeding." *See id.* (where employee reported a dangerous asbestos situation to supervisors, but did not externally report until after termination. Without evidence that he intended to externally report it while employed, the employee could not invoke "whistleblower" protections).

Here, there is substantial evidence that Melendez opposed and reported incidents of child abuse. There is evidence that these incidents would have gone unreported but for Melendez's efforts. Melendez made both internal and external reports about the alleged abuse. These facts coupled with the alleged discriminatory treatment Melendez experienced are sufficient to create a genuine issue of material fact as to whether the District discriminated against Melendez in violation of Oregon's whistleblower statute. Furthermore, there is evidence sufficient to create an issue of fact that Melendez was not rehired as a result of pursuing his legal rights against the District; a reasonable juror could find that Defendant Burrows's testimony that he did not wish to rehire Melendez as a result of alleged fabrications in his Oregon Tort Claims Act complaint was retaliation for Melendez's reports. Therefore, Defendants' motion is denied on this claim as well.

    *d.*    *Wrongful Discharge[2]*

"The elements of a wrongful discharge claim are simple: there must be a discharge and that

---

[2] The terms "discharge" and "termination" are used interchangeably in this disposition.

discharge must be 'wrongful.'" *Moustachetti v. Oregon*, 319 Or. 319, 325, 877 P.2d 66 (1994). In

general, an employee may be terminated for any reason, "absent a contractual, statutory or

constitutional requirement[.]" *Babick v. Oregon Arena Corp.*, 333 Or. 401, 407 n.2, 40 P.3d 1059

(2002). However, "[a] termination is wrongful when an employee is terminated for: (1) fulfilling

an important public duty; or (2) exercising a job-related right that reflects on important public policy.

Determining whether a public duty exists is a question of law." *White*, 2008 U.S. Dist. LEXIS

48103, at *11-12 (citing *Babick*, 33 Or. at 407).

As a threshold matter, the District points out that Melendez has an adequate statutory remedy

and, thus, this common law claim is preempted. "Under Oregon law, the common law remedy for

wrongful discharge or termination is available only in the absence of an adequate statutory remedy."

*Courtney*, 2008 U.S. Dist. LEXIS 53282, at *10 (citing *Delaney v. Taco Time Int'l, Inc.*, 297 Or. 10,

681 P.2d 114, 118 (1984)). In *Draper v. Astoria School District No. 1C*, 995 F. Supp. 1122, 1130-31

(D. Or. 1998), *abrogated on other grounds by Rabkin v. Oregon Health Sciences University*, 350

F.3d 967 (9th Cir .2003), the court stated that "a claim for common law wrongful discharge is not

available in Oregon if (1) an existing remedy adequately protects the public interest in question, or

(2) the legislature has intentionally abrogated the common law remedies by establishing an exclusive

remedy (regardless of whether the courts perceive that remedy to be adequate)."

Until recently, this district recognized a separate claim for wrongful termination where the

plaintiff had also alleged discrimination under Title VII and its state law analogue, ORS 659A.030.

*See Halseth v. B.C. Towing, Inc.*, 2005 U.S. Dist. LEXIS 42080, at *31 (D. Or. Aug. 23, 2005)

("Like most of the other judges and magistrate judges in this district, I have concluded that the

remedies available under Title VII and parallel Oregon state law do not preclude claims for wrongful

discharge under Oregon common law." (citations omitted)). However, recent legislative action has expanded the remedies available under ORS 659A.030 and altered the preemption analysis.

In *Battan v. Allwest Underground, Inc.*, Civ. No. 08-707-BR, 2008 WL 4191467, at *6 (D. Or. Sept. 5, 2008), Judge Brown noted that "the Oregon Legislature enacted House Bill 2260 in 2007, which added § 659A.030 to the list of provisions for which a jury trial and compensatory and punitive damages are available." Courts in this district had previously declined to preempt a wrongful discharge claim because Title VII "cap[ped] compensatory and punitive damages," and ORS 659A.030(1)(f) "limit[ed] recovery of economic damages." *Id.* Under the expanded remedial scheme set forth by House Bill 2260, the court held that "[section] 659A.030(1)(f) provides adequate remedies to the extent Plaintiff intended to base his claim on wrongful discharge in retaliation for pusuing his right to be free from racial discrimination." *Id.; see also Reid v. Evergreen Aviation Ground Logistics Enterprise, Inc.*, Civ. No. 07-1641-AC, 2009 WL 136091, at *16 (D. Or. Jan. 20, 2009) (surveying decisions in the District of Oregon that are in agreement with *Battan.*). Thus, where the plaintiff, as here, seeks relief under ORS 659A.030, he or she has an adequate statutory remedy that preempts a claim for common law wrongful discharge. Accordingly, Melendez's wrongful discharge claim is preempted and the District's motion for summary judgment as to this claim is granted.

III.    **MSJ I & II – Section 1983 claims against individual defendants Burrows and Anthony**[3]

"Section 1983 provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)

---

[3] Melendez stipulated in his response memoranda that he was asserting only § 1983 claims against Defendants Burrows and Anthony in their individual capacities.

OPINION AND ORDER                48                        {KPR}

(citing 42 U.S.C. § 1983). Melendez alleges that Defendants Burrows and Anthony deprived him of his right to equal protection by racially discriminating against him. "In order to prove discrimination in violation of § 1983, a plaintiff must demonstrate that the defendants acted with the intent to discriminate. A plaintiff who fails to establish intentional discrimination for purposes of Title VII . . . fails to establish intentional discrimination for purposes of § 1983." *Sischo-Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1112 (9th Cir. 1991).

A prima facie equal protection claim under section 1983 has two elements: the plaintiff "must prove that [the defendant] 'acted in a discriminatory manner and that the discrimination was intentional.'" *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948 (9th Cir. 2003) (quoting *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000)). With respect to his section 1983 claim, Melendez alleges that Defendant Burrows "was the final decision-making authority in not renewing [Melendez's] contract." (Complaint 12.) Melendez argues in his brief that Defendant Burrows "violated [his] right[] to be free from such discrimination and retaliation." (MSJ I Resp. Memo. 31.) Defendant Burrows argues that Melendez cannot demonstrate that his equal protection rights were violated or that Defendant Burrows intended to deprive him of that right. Because, as Defendant Burrows maintains, Melendez failed to pass the test and was no longer qualified for his position, no inference of racial discrimination can attach to his termination.

Melendez has presented no evidence that Defendant Burrows discriminated against him *based on his race*. To the extent that Defendant Burrows was involved in Melendez's involuntary transfer and termination, there is nothing to suggest that his involvement was motivated by racial animus. Melendez never testified that Defendant Burrows was intentionally discriminatory toward him, nor did he provide evidence in another form that suggests that Defendant Burrows was racially

OPINION AND ORDER                    49                    {KPR}

biased. Thus, even assuming Defendant Burrows acted wrongfully in his dealings with Melendez, there is simply no evidence to support an inference of the racial discrimination that the section 1983 claim requires. Accordingly, Defendant Burrows's motion for summary judgment as to his individual liability under section 1983 is granted.

Melendez also alleges a claim against Defendant Anthony for violation of his equal protection rights contrary to the dictate of section 1983. Defendant Anthony argues that summary judgment on this claim should be granted because the discriminatory acts alleged by Melendez occurred outside the statute of limitations. He makes no other arguments in opposition to this claim, except that he "expressly adopts and incorporates herein the arguments and evidence presented by defendant Burrows and the District in support of their respective motions for summary judgment." (MSJ II, Def. Memo. at 10.) Thus, Defendant Anthony does not make any specific arguments as to the sufficiency of Melendez's evidence, though he does adopt those made by Defendant Burrows and the District.

First, as to the statute of limitations, the action was filed in this court on June 13, 2007. A two-year statute of limitations applies to section 1983 actions. *See* ORS 12.110(1) (2007) ("An action for assault, battery, false imprisonment, or for any injury to the person or rights of another, not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years[.]"). Therefore, Defendant Anthony may only be liable for events occurring after June 13, 2005. This is not disputed. Defendant Anthony claims that all incidents giving rise to Melendez's claim under section 1983 occurred prior to that date and, thus, the claim must fail.

Melendez argues that his involuntary transfer occurred in December 2005 which, alone, is sufficient to defeat Defendant Anthony's statute of limitations argument. He also cites several

events that allegedly took place after July 13, 2005: Defendant Anthony refused to give him a coaching position; told staff members Melendez was a "snitch"; ordered Melendez to perform janitorial tasks; gave Melendez a negative evaluation as an assistant basketball coach; and recommended the elimination of Elizabeth Melendez's position at a school board meeting. (MSJ II, Def. Memo. at 11-12.) Thus, there is a genuine issue of material fact as to whether conduct giving rise to section 1983 liability was committed by Defendant Anthony within the statute of limitations.

Second, Defendant Anthony asserts the arguments and evidence presented by the other defendants in their summary judgment materials. With respect to claims under section 1983, Defendant Burrows did not present evidence or argumentation as to Defendant Anthony's allegedly discriminatory conduct. Rather, Defendant Burrows argued that his own conduct was not motivated by racial animus and that Melendez cannot show otherwise. The District does not address section 1983 claims because none was lodged against the District. Therefore, there are no relevant arguments to apply in defense of Defendant Anthony. As for the evidence submitted by Defendant Burrows and the District, the court declines to perform Defendant Anthony's task and search through the record for evidence to support his arguments. *See* Local Rule 56.1(e) (the court has no independent duty to search the record).

Defendant Anthony also argues that he is entitled to qualified immunity. Government officials may assert the defense of qualified immunity, which bars the officials' liability under specific circumstances. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *accord Saucier*, 533 U.S. 194, 200-201 (2001). A government official performing a discretionary function is entitled to qualified immunity so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457

U.S. 800, 818 (9th Cir. 1982).

The Supreme Court set forth the standard for qualified immunity in *Saucier*, 533 U.S. 194. A government official is entitled to qualified immunity unless his conduct both violated a constitutional right and the constitutional right was clearly defined such that "it would be clear to a [the official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 201-202.[4] To overcome the *Saucier* standard and defeat qualified immunity, the plaintiff cannot rely on conclusory allegations and must allege particular facts. *See Backlund v. Barnhart*, 778 F.2d 1386, 1389 (9th Cir. 1985) ("*Harlow, Davis,* and *Mitchell* make it clear that, to survive summary judgment, a plaintiff must offer more than general conclusory allegations that the defendant violated his *First* or *Fourteenth Amendment* rights. . . . In other words, the plaintiff must show that *the particular facts* of his case support a claim of clearly established right." (emphasis in original)).

This burden is originally on the plaintiff but, if met, the burden shifts to the government official to "prove that their conduct was reasonable even though it might have violated constitutional standards." *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991) (quoting *Baker v. Racansky*, 887 F.2d 183, 185 (9th Cir. 1989) and citing *Benigni v. City of Hemet*, 879 F.2d 472, 479-480 (9th Cir. 1988)). The district court's task is as follows:

---

[4] In *Saucier*, the Supreme Court announced a two-step sequence for resolving qualified immunity claims that required courts to first decide whether a plaintiff had made out a claim of constitutional violation and then, only if plaintiff satisfied that first step, decide whether the constitutional right at issue was "clearly established. 533 U.S. at 201. In *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808 (2009), the Supreme Court held that "the *Saucier* procedure should not be regarded as an inflexible requirement" and that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson*, 129 S. Ct. at 818. The Court acknowledged that the lower courts retained the full discretion to decide whether to apply the *Saucier* procedure. *Pearson*, 129 S. Ct. at 821.

when qualified immunity is at stake, a court must first determine whether the law has been clearly established. If the court decides the law is clearly established, it must then decide whether a reasonable officer would have known that his conduct violated rights. At the third step in the inquiry, it is within the court's discretion to permit limited discovery to determine if there are genuine issues of material fact surrounding the reasonableness of the [official]'s conduct.

*Romero*, 931 F.2d at 628 (internal citations omitted).

"The law prohibiting sex and race discrimination is clearly established. Thus, qualified immunity is not a defense to a claim of intentional discrimination." *McNack*, 2000 U.S. Dist. LEXIS 14381 at *18 (citing *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1180 (9th Cir. 1998)). Defendant Anthony provides no analysis regarding his entitlement to qualified immunity. Indeed, his only claim to this defense arises from his blanket adoption of Defendant Burrows's arguments. The court need not consider whether this supports a qualified immunity defense, because Defendant Anthony's argument is without merit. The law prohibiting racial discrimination in employment is well established and Defendant Anthony undoubtedly would have known that the alleged conduct was in violation of Melendez's rights. Accordingly, Defendant Anthony should not be granted qualified immunity and his motion for summary judgment on this claim is denied.

IV.    Motion to Enlarge the Record

Defendant Burrows and the District separately move to enlarge the record to include a BOLI complaint filed by Melendez on March 26, 2009. In the complaint, Melendez states that he was terminated for failure to pass the test. Defendant Burrows and the District argue that this is "direct evidence" that the reason for terminating Melendez was "his failure to pass a math test[,]" and not discrimination or retaliation for lawful behavior. (Memo. in Support of Motion to Enlarge 2.)

Melendez argues that the statement was merely background information setting forth the

timeline of events giving rise to his BOLI complaint. Melendez subsequently filed a declaration clarifying his position that his termination was based on discrimination and retaliation, and that his failure to pass the test resulted from Defendant Burrows's and the District's failure to accommodate his disability. Melendez requests that, if the court grants the motion to enlarge that it also admit the declaration. Indeed, it is clear from the BOLI complaint and the context of his statement that Melendez was not conceding that his termination was lawful. The complaint specifically references his claims against Defendant Burrows and the District currently before the court. Furthermore, the declaration subsequently filed in conjunction with the BOLI complaint provides additional clarification of this point.

The court sees no reason to include additional documents in the evidentiary record before it, where those documents contain information that is merely duplicative. The complaint and declaration do not add value to the evidentiary record. Neither party will be prejudiced or advantaged by their exclusion and, thus, Defendant Burrows's and the District's motion is denied.

*Undisputed Material Facts*

Pursuant to Rule 56(d)(1), Defendant Anthony requested that the court make factual findings. Accordingly, the court hereby finds the following facts are not genuinely at issue:

1. Melendez was hired by the District in September 2001 as an Educational Assistant.

2. Melendez has a history of anxiety, depression, and insomnia. He has been hospitalized for anxiety, prescribed medication to treat depression and anxiety, and has difficulty sleeping.

3. At the time he applied for employment with the District, Melendez did not request any accommodations related to his disability.

4. Melendez is a legal permanent resident of the United States and a citizen of Mexico.

5. As Melendez was filling out his employment paperwork, he told Defendant Anthony that he was not a United States citizen, but Defendant Anthony told him to indicate that he was, on the paperwork, because it did not matter for their purposes.

6. Throughout his employment, Melendez consistently received performance reviews that indicated he was satisfactorily performing his job duties.

7. The federal government passed a law in 2003 requiring all Educational Assistants to become "highly qualified," under the terms of the No Child Left Behind Act. The District informed Melendez that trainings for the test were available.

8. Melendez took the test several times, each time passing the reading and writing sections, but failing the math section.

9. The District reminded Melendez several times that he needed to pass the test to continue his employment with the district.

10. Shortly before the deadline for passing the test, Melendez presented Defendant Burrows with a note from his doctor stating that Melendez had been seen that day in the urgent care clinic for Generalized Anxiety Disorder.

11. Melendez did not pass the test prior to the deadline and was terminated. After he was notified that he was terminated, Melendez was given an additional nineteen days to pass the test, at which time his termination would be rescinded.

12. Melendez reported an incident of child abuse, the B.H. incident, to Defendant Anthony and subsequently reported the incident to the District and the Morrow County Police Department.

13. Melendez reported to district employees what he considered unfair and racially discriminatory treatment, and complained that he was not given coaching positions despite his repeated attempts

to obtain a coaching position.

14. The District performed an investigation into Melendez's complaints. As a result Defendant Anthony was reprimanded and Rill was dismissed. Melendez received a coaching position.

15. Melendez reported that he received an inappropriate email from French. This incident was investigated and resulted in the issuance of discipline letters to all involved and a reminder to all district employees of the District's internet use policy.

16. At a school board meeting, Melendez again reported his complaints of racial discrimination and retaliation. The Board took no action on Melendez's complaints.

17. In October 2005, Melendez and Defendant Burrows discussed Defendant Burrows belief that, in spite of the District's investigation of events, Melendez continued to discuss his complaints and allegations in inappropriate ways. After this meeting, Melendez received a letter from Defendant Burrows which suggested that Melendez cease engaging in the allegedly inappropriate discussions.

18. In December 2005, Melendez was involuntarily transferred to a different position.

19. In February 2006, French sent derogatory emails to Melendez. When Melendez complained to Defendant Burrows about French's emails, Burrows initially accused Melendez of sending the emails himself.

20. In April 2006, Melendez filed a tort claims notice against the District.

21. Melendez has since applied for positions with the District, but not been hired.

*Conclusions*

For the reasons above stated, the District and Defendant Burrows's Motion for Summary Judgment (#31) is GRANTED in part and DENIED in part. Defendant Anthony's Motion for Summary Judgment (#36) is DENIED. The District and Defendant Burrows's Motion to Strike

(#68) is GRANTED in part and DENIED in part.  The District and Defendant Burrows's Motion to

Supplement the Summary Judgment Record (#82) is DENIED.

DATED this 19th day of November, 2009.

JOHN V. ACOSTA
United States Magistrate Judge